And we're happy to hear argument in our third case, Continental Casualty Company v. Amerisure Insurance Company. Mr. Pinto? May it please the Court, my name is Rick Pinto from the Guilford County Bar in Greensboro, North Carolina. I represent Amerisure Insurance Company, the defendant appellant in this case. I know that we have four issues before the Court on appeal. I'd like to talk about two of them very quickly and then focus on the coverage aspect and the primary excess issue. With regard to the Brock testimony that was stricken pursuant to a motion to strike, I'll point out that the trial court struck that testimony by saying that the interpretation was limited to an opinion about the SIP exclusion. And I would share with the Court that if you review the deposition testimony of Mr. Brock, he talked about insurance industry standards and practices, underwriting policies, selection of language and manuscript policies, all of which he was qualified to talk about and all of which provide expert guidance to the trier of fact. And finally, I would say that any doubt with regard to expert testimony should be resolved in favor of admissibility. With regard to the second topic, I want to talk about attorney's fees and costs in the case. You will recall that the trial court ordered that those be split and that Amerisure reimburse half of those costs back to Continental. I would share with the Court that the Fireman's Fund case and the Jamestown Mutual Insurance Company case, both North Carolina Supreme Court cases, stand for the proposition that North Carolina does not recognize equitable subrogation. And that when an insurance company has their own independent interest to protect, they cannot get their own attorney's fees back from another carrier, even if that other carrier had a duty to provide a defense in the case. Even though Judge Mullen recognized that North Carolina does not recognize the doctrine of equitable subrogation, he nonetheless did that. He said, to be fair, I'm going to give half of the fees from order Amerisure to pay half of the fees back to Continental. With regard to the primary excess question, you will note that I phrased the issue as this. Can SteelFab and CSS, Carolina Steel and Stone, change basically 100 years of law that says that the only parties that can change the terms of a contract are those parties themselves? Here, the question is whether SteelFab and CSS can change the terms of the Amerisure insurance policy without Amerisure's consent, with no policy provision that would allow them to do that, and no statute that requires it. Continental says, yes, they can. The trial court said, yes, they can. Amerisure submits the answer is and should be, no, they cannot. In order to make that determination, one needs to look at the three insurance policies involved, the Amerisure general liability policy, the Amerisure umbrella policy, the Continental general liability policy, and the contract between SteelFab and Carolina Steel and Stone. We will concede all three policies allow their insureds to bind the insurance company by adding additional insureds to the policy. That permission comes in the definition of insured contracts and the exception to the liability assumed in contract exclusion. We concede that CSS could add both KENB and SteelFab as additional insureds under the Amerisure policies, both the CGL policy and the umbrella policy. We concede that the contract requires CSS to provide $1 million of coverage to both of those additional insureds under a general liability policy and an additional $1 million of coverage under an umbrella or excess policy, and that both of those policies be primary and non-contributory. The contract requires that. And we concede that if there is coverage in this case, so that the SIPP exclusion that we'll talk about in just a minute, if there's coverage, we concede that the coverage for the Amerisure's general liability policy is primary. It's primary to Continental's. But the important part is why is it primary? It's primary for three reasons. One, the blanket additional insured endorsement that is part of the CGL, Amerisure's CGL, has an amended other insurance clause attached to it. And that amended other insurance clause says that we will be excess unless there is an underlying contract adding an additional insured, which requires this policy to be primary. And in fact, the contract did require Amerisure's CGL to be primary. Second, the certificate of insurance required that the CGL be primary. And if I can draw the court's attention to the certificate of insurance that was issued by Amerisure, that certificate of insurance reads as follows. Steel, Fab, and B, E, and K are hereby listed as additional insureds. And this is Joint Appendix 86. With respect to general liability and automobile liability, period, no umbrella policy mentioned. And it says, as required by written contract, coverage is written on a primary basis. That is for general liability and automobile liability only. So under Amerisure's general liability policy, they are primary because the blanket insured endorsement, the blanket additional insured endorsement, other insurance clause says so. And because the certificate of insurance that was issued by Amerisure also says so. Continental's policy says in their other insurance clause. Okay. Excuse me, Mr. Condole. I don't mean to interrupt, but I understand that you're giving us a lot of points, a lot of policy provisions. But if you could help us by telling us the overall point you're trying to make, that would help. The overall point initially is that there's coverage under Amerisure's CGL policy, and it is primary coverage. And the reason it's primary coverage is because of the policy terms, not the contract. The policy terms is read under the blanket insured endorsement, blanket additional insured endorsement. Okay. But what about the umbrella policy? Thank you, Your Honor. And I will get there now. That means that any additional insured under the CGL policy is insured automatically. And if coverage to the additional insured is required by the contract, the most we will pay is the amount of the insurance required by the contract, less amounts payable by the CGL. So why isn't SteelFab covered by the umbrella policy, and the duty to cover is triggered when the policy limits under the CGL are exceeded? That's an excellent question. And the reason is that that requires the umbrella policy to insure as an additional insured SteelFab and KB, and the general contractor. Under the Amerisure policy, they are insured pursuant to the terms of the policy. If you will look at the Amerisure umbrella policy, there is no blanket additional insured endorsement. There is none. So therefore, there is. But doesn't it, isn't it triggered, the coverage as to additional insured, if coverage to the additional insured is required by the contract? It does tether coverage to the contract, does it not? They are covered under the umbrella policy. Okay. So maybe I'm missing your point then. Okay. Tell me the point. Tell me where you're going. When someone is covered under a policy, that means they are an insured under that policy. Then to determine whether or not there is coverage for a particular event, a loss, you have to look to the terms of that policy to see if that policy provides coverage to them. They are an insured, so now that we've determined they're insured under both policies. And my point is, if we're now just talking about primary excess under the CGL policy, they are primary for the reasons I've stated. Now we have to see whether they are insured in a primary capacity or excess capacity under the umbrella policy. And in order to make that determination, you have to look to the policy provisions and to the certificate of insurance that was issued. Under the policy provisions, there is no blanket additional insured endorsement. The other insurance clause in the umbrella policy says we are excess to all other coverage, not just underlying coverage, all other coverage, except coverage that was written specifically to be excess to the umbrella policy, and here there is none. And there's no amended other insurance clause. And the certificate of insurance that is listed does not include the umbrella policy when it says that they are primary. Hasn't this Court held that indemnity agreements between the parties can alter the terms? It can if the policy also provides that. And I will point out to the Court that... Regardless of the existence of other insurance clauses, I thought we said that in one of those St. Paul cases. If I can address the St. Paul case... Specialty lines, didn't we say that? I don't think the Court exactly said that. And, first, I will point out this case is not construing an indemnity provision in the underlying contract. In fact... Well, it's a contractual agreement, though, to alter. It is a contractual agreement. So, conceptually, why wouldn't that be the same? I think the St. Paul case was talking about a difference between competing insurance provisions. First, it was construing Virginia law. Next, it was interpreting an indemnification agreement, not a... Here, paragraph 15 of the underlying contract, which just requires additional insurance. Judge Mullen specifically said, I'm not considering the indemnification agreement here because I don't think we have to get there because I believe the AmeriShore Certificate of Insurance grants coverage. So, I think the St. Paul case, which says that a policy can shift an entire loss, is accurate. But it needs to be provided for in the policies as well, either through a blanket additional insured endorsement or by the issuance of a certificate of insurance which allows it. To hold otherwise is saying that parties, not parties to the insurance contract, can change the terms of an insurance contract. And that is something that ought not to be allowed and is not allowed. If the analysis ended just with a consideration of the policies, there's no question that the AmeriShore umbrella policy would be excess to Continentals policy. Judge Mullen says, however, that the contract trumps that. But he says it for some good reasons which, if true, would support his opinion. He says the AmeriShore Certificate of Insurance issued to CSS states that coverage is written on a primary basis. If that were true, his holding that the umbrella policy is primary would also be true. But as you've just seen, it was not true. The certificate of insurance does not mention the umbrella policy. He also says the certificate of insurance reflects the intent of AmeriShore that all of its policies listed on the certificate of insurance is primary. Again, he makes that statement on page 19 of his opinion and on page 15 of his opinion. If they were true, that would support his ruling. But those are not true, and his opinion is in error as a result of that. He also cites the proposition that downstream subcontractors' insurance, including excess insurance, should always pay first. He cites Continental Casualty Zurich case, the DeMatteis construction case. Neither of those cases address excess policies. Right, but I don't mean to cut you off, but it seems to me that this is like there's a bit of a smoke screen going on here. You know, they were claiming that the ROSIP, how do you pronounce that? The Controlled Insurance Plan. Yeah, I haven't heard you mention that here. Why not? Because that's an issue that only has to do with whether there is coverage at all under the policies, which is my next topic. That was part of your argument in the brief, wasn't it? It is part of my argument in the brief and today. Yeah, why haven't you heard about it? I haven't gotten there yet, but I will. Yeah, well, you have four, three, two, one second. I will get there and rebut. Thank you. Good morning, Your Honor. Karen Ventra. Can you hear me? I can't tell if you can hear me. If you can just keep on talking. Thank you, Your Honor. Karen Ventral for Continental Casualty. I'm struck by the fact that demerit sure continues to evade what is the central issue in this case, which is the duty to defend. North Carolina law places a heavy burden on an insurer that seeks to escape the duty to defend. It also places severe consequences if an insurer refuses to defend, even if it's based on an honest mistake. Despite these risks and despite the information Amerisher had, that CSS was not included in any controlled insurance program, Amerisher refused to defend its insured steel fab and BE&K. Now, I don't know whether Amerisher has now conceded there's a duty to defend. Mr. Pinto didn't address it. I will briefly address why Amerisher's refusal was unjustified. First, Amerisher had a duty to defend because the Miller complaint did not allege all elements necessary for application of Amerisher's proprietary controlled insurance program exclusion, and I'll call that the SIP exclusion. The Miller complaint makes no mention of insurance, let alone a controlled insurance program. It also did not allege that Miller's injury was solely and approximately caused by CSS's operations, which is what North Carolina law requires, and that's the state capital case. It also does not bar coverage for claims against the additional insurance here, because by virtue of the language that Amerisher chose, when it chose arising out of your operations, your is defined in the policies to mean the named insured CSS, and under the Penske ruling of the North Carolina Court of Appeals, that exclusion only bars coverage for claims against the named insured, not for claims against additional insureds that we have here. Additionally, its refusal to defend was unjustified because the Miller complaint arguably alleged a mere possibility of covered liability. And finally, because Amerisher had information at the time of the tender that CSS was not included in any SIP, it had a duty to defend. Now, in the trial court, Amerisher advocated creation of an exception to these well-established rules, arguing that a complaint can be construed to suggest facts to fit the exclusion. But Judge Mellon correctly concluded that that was wrong for several reasons. First, if a complaint is silent with respect to facts necessary to negate a duty to defend, then the insurer must defend. And second, North Carolina law prohibits an insurer from relying on information outside the complaint and policy to escape a duty to defend. So Amerisher had information obligating it to defend, and the complaint plainly obligated it to defend. And Judge Mellon reached the right conclusion that under North Carolina law, Amerisher had a duty to defend, and as a consequence of its wrongful breach of that duty, it is liable for all defense costs and settlement. And that's at Joint Appendix 2090. So at that point, he got it right, and we asked the court to affirm that part of the decision. With respect to the priority of coverage and the questions that Judge Keenan asked, the question is, does the Amerisher umbrella policy attach immediately above the Amerisher primary policy? And the answer actually is dictated by the coverage provisions of the Amerisher umbrella policy and the SteelFab CSS subcontract, and the case law construing that language, making the umbrella policy attach directly above and after the Amerisher primary policy. So we start with the insuring agreement of the umbrella policy. It states that Amerisher will pay amounts in excess of the retained limit, which is defined to mean the amount of the, quote, underlying, close quote, insurance. That's at JA 534. Amerisher's umbrella policy defines underlying insurance to mean insurance that is scheduled, so it's listed in the schedule of underlying insurance. The only GL policy in that schedule is the Amerisher primary policy. No other insurance is listed. And the North Carolina Supreme Court held in Gaston County that when an excess policy like the one here states in its insuring agreement that it pays immediately excess of scheduled underlying insurance, it pays immediately after that scheduled underlying policy, despite the existence of other insurance. In fact, in Gaston County, the court held that the excess umbrella policy paid first before an unscheduled primary policy. Further, the additional insured language that Judge Keenan pointed out in the umbrella policy reinforces the intent that the primary policy pay immediately after the amount of the Amerisher primary policy, regardless of other insurance. So the umbrella policy tethers itself to the contract, to the subcontract language. The umbrella language grants additional insured coverage by saying that it pays the amount required by contract, less any amounts payable by, quote, underlying insurance, close quote. So that means the umbrella pays the amount required by contract for additional insureds, less the $1 million payable by the Amerisher primary policy. The subcontract is clear, and Amerisher now concedes this point in its oral argument. Adjoined Appendix 1331 is the subcontractor's insurance requirements. It requires at least $2 million of liability insurance. That's general liability and umbrella liability. And it also states that that requirement must have additional insured coverage. That's in bold italics at JA 1331. Now, Amerisher relies on the certificate of insurance, but it's well established in insurance law that a certificate of insurance does not vary and cannot vary or alter the terms of the insurance contracts. And so I would urge the Court to look to both the umbrella policy language and the additional insured language in the Amerisher umbrella policy. And it's important to note that Amerisher chose this particular language. It drafted this policy. It could have chosen language making its umbrella policy attach excess of all other insurance. It could have said in its insuring agreement, as Continental's umbrella did, that it attaches excess of both scheduled and unscheduled. But it didn't do that. And this Court is required by North Carolina law to give effect to the contract language as written, and it prohibits the Court from rewriting a contract to insert language that Amerisher chose not to insert. Amerisher conveniently ignores these insuring provisions, instead resorting to another insurance argument. But that argument is unavailing for two reasons. First, coverage provisions should take precedent over other insurance clauses. And, in fact, in Gaston County, the North Carolina Supreme Court looked first to the insuring agreement, and it found that that language alone made clear that the excess policy paid before an unscheduled primary policy. Second, as this Court has held in St. Paul, other insurance clauses are irrelevant to determining who pays under these facts. And the second reason why Amerisher's umbrella policy pays before Continental's policy is that the SteelFab CSS subcontract says it does. And remember, the umbrella policy is tethered to the subcontract, and the additional insured coverage afforded by that umbrella policy is tethered to the requirements of the subcontract. And so this Court rightfully said in St. Paul, and a majority of courts have held that resolution of the priority of coverage issue is controlled by the contract between the insureds. And that makes sense, again, because the Amerisher umbrella policy tethers it to the language of the subcontract and their insurance requirements of the subcontract. And what does that subcontract require? Well, it required both GL and umbrella insurance and additional insured coverage. It also required that all insurance required shall be primary and non-contributory to any other insurance of SteelFab and BE&K. That's again at Joint Appendix 1331. Amerisher's corporate designee admitted, he admitted under oath, that any coverage afforded under the umbrella policy, under the umbrella, would be afforded, excuse me, would be primary and non-contributory. And that's at Joint Appendix 1462. That's at page 206, 3 to 15. So every case addressing the primary and non-contributory language has held that it makes all of the subcontractors' insurance, including its umbrella insurance, primary, meaning it must pay first. And I would direct the Court's attention to the case law that we cite at pages 40 to 42 of our brief, and particularly the West Bend case, because Amerisher in that case took the same position that Continental is taking here. In West Bend, the Court held that such language made the subcontractors' umbrella policy primary. Those were the words the Court used and required it to pay before the upstream contractors' own insurance. But even without primary non-contributory language, we have the St. Paul line of cases, where St. Paul endorsed the Walmart reasoning where parties to a contract can shift the risk of loss to an entire, excuse me, the entire risk of loss downstream, and all of that party's insurance pays first. The majority position endorsed by this Court in St. Paul and the Walmart line of cases gives effect to the purpose of the insurance to cover the risk of loss. It gives effect to the party's contractual intent to shift that risk of loss downstream. Counsel? Yes. I'm sorry. I was thinking your sentence was ending and it wasn't. I will stop. No, no, no. I apologize. My question is, and I think we understand your argument, is to what extent do you depart materially from the district court's analysis other than the awarding of fees? Other than the awarding of fees. Okay. I would suggest that he focused in on the other insurance clause of the AmeriShare umbrella policy rather than looking at the insuring agreement first and the coverage provision afforded by the additional insured coverage. So as you rightly noted, under the umbrella, additional insureds who are insured under the primary are automatically additional insureds under the umbrella. And so I think that's where he faulted because you always look to coverage provisions first. And on the question of the order on defense costs, I would just note that the district court started outright when he held that AmeriShare breached its duty to defend, and under North Carolina law that means that AmeriShare is liable for all defense costs. He was spot on in following North Carolina law up to that point, and all he needed to do was to order that AmeriShare reimburse Continental. Then he ventured off and he disregarded his own findings, he disregarded the policy language, and he disregarded North Carolina law when he resorted to equity to split those costs. Okay. I'm going to jump back just for a minute, and I apologize for going back. Does it matter whether the parties are contracting for assignment of liability versus indemnity, direct indemnity? In other words, the Walmart line of cases, are they totally analogous? Do we need to go through any preliminary steps before we consider whether to apply them? Okay. I think I understand your question. I would say no because in this court, in the St. Paul decision, while the court very briefly addressed the indemnity obligation, basically all it did was look at the complaint and it looked at the wording of the indemnity contract. There was no finding of either assigning liability to one or the other, and here, of course, CSS was not a party because of the workers' comp exclusivity remedy, so it was barred from suing CSS. But the subcontract specifically retains the right by SteelFab and BNK to pursue CSS for that indemnification regardless of the workers' comp exclusive remedy. That's in paragraph 14 of the subcontract. I have 10 seconds left. Briefly, the district court got it wrong on ordering defense costs to be split. I urge the court, I will address that in my reply if I may. Thank you. Thank you. Ms. Pinto, you have five minutes and you have a question. What Ms. Ventral is calling the elephant in the room, the duty to defend. Why didn't we hear about that from you in the first place? Because that's part of the coverage analysis and I will get right to that. Because the duties were a lot broader than the duty to provide. That's what the case law says, Judge Keenan, and what the case law means by that is when you have a policy that provides coverage for certain things, if there is a complaint that alleges nine causes of action and you have coverage for one of them, you have a duty to defend all nine. So the duty to defend is broad. But also if you are arguably on the hook, you've got to defend. Exactly right. That's exactly right. Here, I'll just get right to the SIP exclusion. The SIP exclusion precludes coverage in this case, and that is why AmeriShare had no duty to defend. The SIP exclusion says that if- The CSS didn't buy into it. They were not enrolled in the Zurich general liability policy. They benefited the exclusion without having participated in it, right? Well, I don't know if CSS benefited. CSS was not sued. But it does benefit AmeriShare because CSS was not enrolled, I suppose, if that's the analysis of the court. But that's not what the exclusion says. The exclusion says if CSS's operations were included in the program, then there's no coverage. And there's case law directly on that point. What about the contract? I mean, if you're right about the RoHSIP, yes, you win. But there's a very good argument that you are stuck under the SteelFab contract with CSS. Only if this court allows a subcontract to change the terms of an insurance policy. And if this court does, where do you draw the line? What if that subcontract had said we require $300 million worth of liability coverage? Under that analysis, AmeriShare would now have to provide $300 million worth of coverage. Or what if it said you have to provide workers' comp coverage? Well, yeah, but the umbrella policy did say any additional insured under the CGL is insured automatically. And if coverage to the additional insured is required by the contract. Right. They become an insured. They become an insured. And there's no question. They are an insured under the umbrella policy subject to the terms of that umbrella policy and any certificate of insurance that's issued. With regard to the SIP exclusion itself, the manual, which is incorporated into the contract, which was submitted to AmeriShare. So AmeriShare knew there was a SIP program in place at the time it denied coverage. Because the manual says that the operations of all subcontractors are included in the SIP unless those operations are specifically excluded. The steel application was not specifically excluded. And therefore, under the definition, their operations were included. Cottonelle and Judge Mullen say, without legal authority, that if the operations are included, that must mean that CSS was insured by or enrolled in. There's no wording to that effect. The StructureTone case has it right on. It was the same exact situation in StructureTone. An insured was not enrolled in a program. There were two additional insureds. The insurance company said there was a SIP exclusion, no coverage. StructureTone said the language of the exclusion does not require KEC, who is the insured, to be enrolled in the wrap-up program, but that a wrap-up program exists. They also said the exclusion applied to additional insureds because the exclusion application turned on KEC's operations, not their enrollment in the insurance policy. Exact argument we are making here. With regard to whether we can look to the SIP exclusion and look outside the four corners of the contract, the waste management case and the other cases cited on 36 and 37 of our brief stand for the proposition that you can. The Kepner and the composite structure case is also cited in the brief, say, if it's not an issue that will be decided in the underlying litigation and not likely to be put in the complaint. Excuse me, but the duty to defend, you've got to look at the complaint and you've got to look at the policies, right? And you're reciting the ROSIP manual to us as a reason why you didn't have a duty to defend. And that just doesn't make sense. I think the law, Your Honor, is that you can look to extrinsic evidence beyond the complaint and the policy if the fact that you need is not something that would be brought up in the complaint and would not be decided by the trier of fact in the underlying claim, like the existence of a ROSIP policy, or what if a policy, the premium lapsed and the policy was canceled? Under that theory, you still have to come in and defend because there's no allegation the policy was canceled in the underlying complaint. So there are certain circumstances where you can go beyond the complaint and look at extrinsic evidence. Thank you. Thank you, ma'am. Just on that last point that Mr. Pinto raised, it's absolutely clear under North Carolina law that an insurer seeking to escape its duty to defend cannot go outside the complaint and the policy. And I believe, actually, that's the Vigilant case in this court and the Peace College case as well. Actually, you're supposed to confine yourself to your cross-appeal. I will do that, Your Honor. Okay. Thank you. Okay. Where we left off. On the cross-appeal, as I stated before, Judge Mellon started out getting it right under North Carolina law. He held that a merisher wrongfully breached its duty to defend. It's liable for defense and settlement costs. At that point, all he needed to do was to order a merisher to reimburse Continental for 100% of the defense costs. But then he ventured off. His order dividing defense costs, in other words, making a merisher pay only half of the defense costs, is wrong for four reasons. First, having found that a merisher wrongfully breached its duty to defend, he was required by North Carolina law to find that a merisher must reimburse Continental for all defense costs paid. Having found that by operation of the language in the subcontract, America must pay first and without contribution from Continental, the court should have held that a merisher is liable for all costs of defense without any share being allocated to Continental. And third, I would say that the order on defense costs is contrary to North Carolina law, and that's specifically the Jamestown and Horace Mann decisions. Both of those cases recognized that a non-defending insurer whose policy language makes it primary, and that's the merisher policy here, must fully reimburse defense costs paid by an insurer whose policy language makes it excess, and that's the Continental policy. So that is the case here. A merisher's policy states it is primary without contribution. Continental's policy states it is excess with no duty to defend under these circumstances. And so that is if you look to the language of the merisher primary policy and the Continental policy, the policy language provides the answer as to who pays first and who pays a loan. And it states specifically that Continental's policy is excess with no duty to defend. So the district court got it wrong when it held that both Continental and a merisher had a duty to defend because the policies specifically say that only a merisher has the duty to defend, and Continental has no duty to defend under these circumstances. And finally, the court's resort to equity was just plain wrong. He had the case law, he had the policy language, and he relied on two cases, Ames and Vigilant, that are an opposite. Those cases involved consecutive insurers. They covered different periods of time, different conduct during those different periods of time. So in that case, it was true to say that each had a separate and independent duty to defend. That's not so here because, as I said, a merisher's primary policy makes it primary without contribution. Continental's policy states it is excess with no duty to defend. Additionally, Ames and Vigilant did not involve that kind of contract language. It did not involve the language we have here, and particularly the subcontract, that shifted all risk of loss, including defense, to CSS and its insurer. Also, having found that a merisher breached its duty to defend unjustifiably, it is inconsistent with equitable principles to essentially then reward a merisher by only making it pay one-half of the defense cost, and that's essentially what the court did. So under North Carolina law and the policy language here, a merisher is liable for all defense costs. We ask the court to reverse the district court's decision on defense costs and order a merisher to reimburse Continental for all defense costs paid. Thank you very much. Thank you. We will ask our clerk to adjourn court for the day, and then we'll come down and greet the lawyers.
judges: Diana Gribbon Motz, William B. Traxler Jr., Barbara Milano Keenan